## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

ENUTROFF, LLC,

        *Plaintiff,*

  vs.

EPIC EMERGENT ENERGY, INC.,
DALE S. MORGAN, DOUGLAS
McKINNON, and CLYDE H. PITTMAN,
JR.,

        *Defendants.*

Case No. 14-CV-2389- EFM-GLR

### MEMORANDUM AND ORDER

This matter comes before the Court on Defendants Epic Emergent Energy, Inc. ("Epic"), Dale Morgan, Douglas McKinnon, and Clyde Pittman's Motion to Dismiss (Doc. 9). Defendants ask the Court to dismiss Plaintiff Enutroff, LLC's ("Enutroff's") First Amended Complaint for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). In addition, Defendants Epic and McKinnon ask the Court to dismiss the amended complaint for insufficient process and insufficient service of process under Fed. R. Civ. P. 12(b)(4) and (5). Because the Court finds that it does not have personal jurisdiction over Defendants, the Court grants Defendants' motion.

## I.      Factual and Procedural Background[1]

### A.      The Parties

Plaintiff Enutroff is a single-member limited liability company organized under Nevada law with its principal place of business in Kansas.  Enutroff's sole member, James Loeffelbein, resides in Kansas.  Enutroff is an investment company that provides equity capital to other companies somehow engaged in the energy business, whether by way of exploration, production, refining, or distribution.

Defendant Epic is a Texas corporation with its principal place of business in Texas.  Epic is a start-up company seeking to gain a foothold in the field of gas-to-liquids technology (known as "GTL technology").  GTL technology involves the conversion of native natural gas into diesel fuel and other high-value liquid fuels.  Defendant Pittman is Epic's Chief Executive Officer and a resident of Texas.  Defendant Morgan is one of Epic's senior shareholders and a member of its board of directors.  He also resides in Texas.  Defendant McKinnon is Epic's President, a member of Epic's board of directors, and a Colorado resident.

### B.      The Parties' Relationship and Agreements

In early 2014, Enutroff received a telephone call in Kansas from Alan Chaillet.  Chaillet identified himself as Epic's agent and indicated that he was aware that Enutroff invested in energy companies like Epic.  During this and subsequent conversations with Enutroff, Chaillet told Enutroff about Epic's business prospects and proprietary technology.  When Chaillet asked Enutroff if it wanted to learn more about Epic, Enutroff answered affirmatively.

---

[1] Drawing all reasonable inferences in favor of Plaintiff, the facts are taken from the First Amended Complaint, its attached exhibits, and the declarations and exhibits attached to the parties' briefs.

In the context of conference calls, during which Enutroff was located in Kansas, Chaillet and Defendants Pittman, Morgan, and McKinnon made representations regarding Epic's technology, business prospects, and company stock.   Specifically, Enutroff claims that Defendants told Enutroff that Epic had negotiated a binding agreement with HollyFrontier Corp., one of the largest independent petroleum refiners in the United States, and that this agreement required HollyFrontier to purchase GTL-produced fuels from Epic on a fixed, invariable, and "take-or-pay" basis.[2]   Defendants also allegedly told Enutroff that Epic's stock was owned by a number of individual shareholders exclusively for investment purposes and that no single investor or group of affiliated investors owned any controlling substantial percentage of Epic stock.   Accordingly, Defendants allegedly represented that Epic could issue and sell up to thirty percent of Epic stock to Enutroff without an existing shareholder preventing such issuance and sale.

On March 11, 2014, Chaillet sent a business plan to Enutroff in Kansas that included a memorandum from Defendant Pittman.   Three days later, on March 14, 2014, Chaillet emailed Enutroff, stating that Defendant McKinnon would "present the financial model – via Go-To meeting" or through "conference call"; that HollyFrontier would provide a document in the next week; and that Chaillet was a "key person for sourcing equity and financing for Epic and [would] likely have a principal role in the Company."[3]   Chaillet sent another email to Enutroff in Kansas on March 19, 2014, confirming the conference call in his previous email and stating that he had been on the phone with HollyFrontier that morning and learned the date by which HollyFrontier hoped to have a fuels purchase document for Epic's review.

---

[2] Enutroff's Response to Defendants' Motion to Dismiss, Doc. 17, p. 15.

[3] Chaillet Email to Loeffelbein, Doc. 17-3, p. 1.

Enutroff agreed to invest in Epic, and the parties entered into two agreements to memorialize their relationship. The first agreement is a Consulting and Fee Agreement (the "Consulting Agreement") dated February 1, 2014. Loeffelbein signed this document on behalf of Enutroff on February 1, 2014, in Kansas. Defendant Pittman signed the document in his capacity as Epic's CEO on March 26, 2014, in Texas. Under this agreement, Enutroff agreed to perform "general consulting services" related to Epic's affairs and "liason with the investment community."[4] Specifically, Enutroff agreed to: analyze and provide advice on "strategy, position, and business direction in order to optimize its business success in general regarding Epic's upstream gas and oil exploration, drilling completion, and production opportunities"; provide information, advice, and negotiations with potential joint venture partners, customers, or investors" on Epic's behalf; and "manage communications and relationship with the investment community."[5] In return, Epic agreed to convey to Enutroff three percent of Epic's common outstanding shares as of February 1, 2014.

The second agreement is the Convertible Loan Agreement (the "Loan Agreement") dated February 1, 2014. Leoffelbien executed this agreement on Enutroff's behalf on February 1, 2014, in Kansas, and Defendant Pittman executed this agreement on Epic's behalf, in Texas, on March 24, 2014. The Loan Agreement provides that Enutroff will advance $200,000 to Epic in as many increments and in such amounts per increment as Enutroff might determine, provided that $100,000 will be paid on or before March 31, 2014, and the remainder paid not later than May 30, 2014. The Loan Agreement also provides that Enutroff would have the right to convert the principal and accrued interest under the loan into shares of Epic's common stock. If the loan

---

[4] Consulting Agreement, Doc. 10-6, p. 1.

[5] *Id.*

amount is not converted to Epic stock, Epic is required to repay the loan one year after February 1, 2014, including interest, at a rate of eight percent per annum.  Pursuant to this agreement, Enutroff transferred $100,000 in cash from a Kansas bank to Epic on or about March 24, 2014.

Enutroff and Epic's relationship began to unravel in April 2014, after Pittman sent Enutroff an email informing it that HollyFrontier decided not to enter into an agreement with Epic to purchase Epic's fuel.  Enutroff then demanded additional information regarding the state and nature of Epic's business, prospects, assets, management, and directorate.  After these and additional demands for information, Epic informed Enutroff that there was an existing shareholder who held thirty percent of its issued outstanding shares; that Epic was having trouble with this shareholder; and that such shareholder could prevent Epic from giving Enutroff a thirty percent ownership interest in Epic.

Enutroff then demanded that Epic return its $100,000 payment pursuant to the Loan Agreement.  The parties exchanged several emails on April 30, 2014, through Loeffelbein, who was located in Kansas, and Epic's lawyer, who was located in Texas.  During this email exchange, Epic's attorney stated that Epic would agree to return Enutroff's funds, terminate the Consulting and Loan Agreements, accept a return of the Epic stock by Enutroff, and exchange a mutual release.  Epic's attorney also asked whether Enutroff would like him to draft the settlement agreement.  Loeffelbein replied "that's fine."[6]  However, the parties have not executed a settlement agreement, and Epic has not returned the $100,000 payment under the Loan Agreement to Enutroff.

C.      **The Current Action between the Parties**

---

[6] Email Exchange between Loeffelbein and Epic, Doc. 17-6, p. 1.

Enutroff filed suit against Defendants on July 1, 2014, in the District Court of Johnson County, Kansas.  Defendants removed the action to this Court on August 6, 2014.  On August 8, 2014, Enutroff filed its First Amended Complaint alleging that Defendants made misrepresentations regarding Epic's relationship with HollyFrontier, Epic's proprietary technology, and Epic's ability to issue and sell stock that induced Enutroff to enter into the Consulting and Loan Agreements.  Enutroff also alleges that the parties entered into a valid and enforceable settlement agreement that Defendants have breached. Enutroff's First Amended Complaint asserts the following claims:  (1) enforcement of the settlement agreement, (2) violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, (3) violation of the Kansas Securities Act, (4) fraud, and (5) negligent misrepresentation.   In response, Defendants filed a motion to dismiss, seeking dismissal on the basis of lack of personal jurisdiction.  Defendants Epic and McKinnon also seek dismissal for insufficient process and insufficient service of process.  Defendants' motion is now before the Court.

## II.     Legal Standard

### A.     Personal Jurisdiction

A plaintiff opposing a motion to dismiss based on lack of personal jurisdiction bears the burden of showing that jurisdiction over the defendant is appropriate.[7]  In a pretrial motion to dismiss, when the matter is decided on the basis of affidavits and written materials, the plaintiff is only required to make a prima facie showing that personal jurisdiction is proper to avoid dismissal.[8]   Once the plaintiff makes a prima facie showing, the defendant must "present a

---

[7] *Thermal Components Co. v. Griffith*, 98 F. Supp. 2d 1224, 1227 (D. Kan. 2000) (citing *Kuenzle v. HTM Sport–Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996)).

[8] *Id.*

compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.' "[9]

"The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[10] "However, only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true."[11] "The plaintiff has the duty to support jurisdictional allegations in a complaint by competent proof of the supporting facts if the jurisdictional allegations are challenged by an appropriate pleading."[12]

## B.   Service of Process

Service of process upon a corporation is governed by Fed. R. Civ. P. 4(h), and service of process upon an individual is governed by Fed. R. Civ. P. 4(e).  Service upon a corporation or individual may be made in accordance with applicable state law.[13]  Alternatively, service upon a corporation may be made "by delivering a copy of the summons and of the complaint, to an officer, a managing or general agent, or any other agent authorized" to accept service.[14]  Service upon an individual may be made in person, by leaving a copy at the individual's dwelling place

---

[9] *Id.* at 1227 (citing *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998)).

[10] *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (internal quotations omitted).

[11] *Id.*

[12] *Id.* at 1508 (quoting *Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989)).

[13] Fed. R. Civ. P. 4(e)(1) and (h)(1).

[14] Fed. R. Civ. P. 4(h)(1)(B).

with someone of suitable age and discretion, or by delivery to an agent authorized by appointment or law to accept service of process.[15]

Service is insufficient where a party serves the wrong person or serves an individual not permitted to accept service.[16]  The burden is on the plaintiff to make a prima facie showing that it satisfied the statutory and due process demands for the court to exercise jurisdiction.[17]  Although the parties may submit affidavits in support of a motion to dismiss for insufficiency of service of process, the court must give the plaintiff the benefit of any factual doubt where they are contested.[18]

### III.    Analysis

### A.    Personal Jurisdiction under the Kansas Long Arm Statute

"Where a federal lawsuit is based on diversity of citizenship, the court's jurisdiction over a nonresident defendant is determined by the law of the forum state."[19]  The party seeking to establish personal jurisdiction over a diverse litigant must make two showings.  First, it must show that jurisdiction is legitimate under the state's long-arm statute.  Second, it must show that jurisdiction does not offend the Due Process Clause of the Fourteenth Amendment.[20]  The Kansas Supreme Court has interpreted Kansas' long-arm statute to extend jurisdiction to the

---

[15] Fed. R. Civ. P. 4(e)(2)(A)-(C).

[16] *Pope v. Boy Scouts of Am.*, 2006 WL 3199423, at *1 (D. Kan. Nov. 3, 2006).

[17] *Id.*

[18] *Id.*

[19] *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011).

[20] *Kuenzle*, 102 F.3d at 455.

fullest extent allowed by the Due Process Clause of the Fourteenth Amendment.[21]  Thus, in this case, the Court need not conduct a statutory analysis apart from the due process analysis.[22]

The due process analysis involves a two-step inquiry.[23]  First, the plaintiff must show that the non-resident defendant has "minimum contacts" with the forum state by demonstrating that it purposefully availed itself of the protections or benefits of the state's laws, such that it should reasonably anticipate being haled into court there.[24]  If the plaintiff successfully establishes such minimum contacts, the second inquiry—the "reasonableness test"—shifts the burden to the defendant to prove that the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice."[25]

### 1.    Minimum Contacts

The Constitutional touchstone of the Due Process Clause is whether the defendant purposefully established minimum contacts in the forum state.[26]  The minimum contacts requirement assures a reasonable expectation in the out-of-state defendant that it might be brought into court in the forum state.[27]  This requirement ensures "that a defendant will not be

---

[21] *Merriman v. Crompton Corp.*, 282 Kan. 433, 459, 146 P.3d 162, 179 (Kan. 2006).

[22] *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010).

[23] *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008).

[24] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); s*ee also Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.").

[25] *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987); *see also AST Sports Sci., Inc.*, 514 F.3d at 1057.

[26] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

[27] *AST Sports Sci., Inc.*, 514 F.3d at 1057-58.

subject to the laws of a jurisdiction 'solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person.' "[28]   To meet this standard, a plaintiff must show either specific or general jurisdiction.[29]

Here, Plaintiff does not allege general jurisdiction, but alleges that Defendants had minimum contacts with Kansas based on specific jurisdiction.  Specific jurisdiction exists "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."[30]   In evaluating the "purposefully directed" element, the Tenth Circuit has explained:

> The first element can appear in different guises.  In the tort context, we often ask whether the nonresident defendant "purposefully directed" its activities at the forum state; in contract cases, meanwhile, we sometimes ask whether the defendant "purposefully availed" itself of the privilege of conducting activities or consummating a transaction in the forum state.  In all events, the shared aim of "purposeful direction" doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely "random, fortuitous, or attenuated contacts" with the forum state.[31]

In addition, the Supreme Court recently addressed the issue of "minimum contacts" necessary to create specific jurisdiction in *Walden v. Fiore*.[32]   The Court explained, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must

---

[28] *Id.* (quoting *Burger King Corp.*, 471 U.S. at 475).

[29] *OMI Holdings, Inc.*, 149 F.3d at 1090-91.

[30] *Id.* at 1091 (quoting *Burger King Corp.*, 471 U.S. at 472).

[31] *Dudnikov v. Vermilion Fine Arts*, 514 F.3d 1063, 1071 (10th Cir. 2008) (internal citations omitted).

[32] 134 S.Ct. 1115, 1121 (2014).

create a substantial connection with the forum State."[33]  The Court emphasized two aspects that must be present for a state to exercise jurisdiction over a non-resident defendant.[34]

First, the Court emphasized that the relationship between the defendant and the forum State must arise out of contacts that the "*defendant himself*" creates with the forum State.[35]  The Court stated that it has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff . . . and the forum State."[36]  "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be decisive in determining whether the defendant's due process rights are violated."[37]

Second, the jurisdictional analysis must focus on "the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there."[38]  A plaintiff "cannot be the only link between the defendant and the forum."[39]  "Rather, it is the defendant's conduct that must form the necessary connection with the forum State is the basis for its jurisdiction over him."[40]

Because Plaintiff alleges both contract and tort causes of action, the Court will look to case law interpreting both the "purposefully directed" and "purposefully availed" requirements.[41]

---

[33] *Id.*

[34] See *id.* at 1121-22.

[35] *Id.* at 1122 (emphasis original).

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 1123.

[41] *Dudnikov*, 514 F.3d at 1071.

a.      Contract Analysis

Enutroff asserts that Defendants purposefully availed themselves of the privileges of conducting activities in Kansas by entering into three contracts with a company that has its principal place of business in Kansas that were to be partially performed there.[42]   The mere existence of a contract with a Kansas resident is insufficient to establish the requisite minimum contacts in the forum state.[43]   But, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other state for the consequences of their activities."[44]   The Court must examine the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."[45]

Enutroff argues that the Court has personal jurisdiction over Defendants because the Consulting Agreement, Loan Agreement, and Settlement Agreement require some measure of performance by Enutroff in Kansas.   The Court disagrees.   Under *Walden*, Enutroff's unilateral activities in Kansas do not create minimum contacts necessary to exert personal jurisdiction over non-resident defendants.   The relevant analysis is Defendants' contacts with the forum state. Enutroff's connection with Kansas, no matter how significant, is not decisive in determining

---

[42] The Kansas Long Arm Statute provides that any person who "enters into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state" is subject to the jurisdiction of the courts of this state for any claim for relief.  K.S.A. 60-308(b)(1)(E).

[43] *See Burger King Corp*., 471 U.S. at 478; *TH Agric. & Nutrition, LLC v. Ace European Grp., Ltd*., 488 F.3d 1282 (10th Cir. 2007).

[44] *Burger King Corp.*, 471 U.S. at 473 (quoting *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647 (1950)).

[45] *Id*. at 479; *Marcus Food Co*., 671 F.3d at 1166 (citations omitted).

-12-

whether Defendants' due process rights would be violated by asserting personal jurisdiction in Kansas.

Regardless, the Court finds that Enutroff has established sufficient minimum contacts with regard to Defendant Epic. Enutroff alleges that its first contact with Epic was when Chaillet called Loeffelbein in Kansas in early 2014. Courts consider a defendant's solicitation to be a significant factor in determining minimum contacts with the state of Kansas.[46] According to Enutroff, it was Epic, not Enutroff who initiated contact between the parties and asked Enutroff if it wanted to learn more about Epic's business opportunities and technology. Enutroff also alleges that Epic engaged in a series of conference calls and emails with Enutroff, during which Enutroff was located in Kansas, to negotiate the Consulting and Loan Agreements. And finally, with regard to the Settlement Agreement, Enutroff alleges that it was Epic who initiated the initial settlement offer through an email directed to Enutroff in Kansas. Taken as a whole, these allegations establish that Epic purposefully availed itself of Kansas, so that it has sufficient minimum contacts with the forum state.

Looking at the individual Defendants, the Court finds that Enutroff has not established sufficient minimum contacts. The only connection Enutroff alleges between Defendants Morgan and McKinnon and Kansas is that Defendants attended the conference calls between the parties during negotiation of the Consulting and Fee Agreements. Phone calls and letters, standing alone, do not rise to the level of minimum contacts.[47] Defendant Pittman was also involved on these conference calls and sent an additional memorandum to Enutroff with Epic's business plan

---

[46] *Proud Veterans, LLC v. Ben-Menashe*, 2014 WL 791200, at *7 (D. Kan. Feb. 27, 2014) (citing *Cargill Meat Solutions Corp. v. Premium Beef Feeders*, LLC, 2014 WL 172197, at *3 (D. Kan. Jan. 6, 2014); *Hutton & Hutton Law Firm, LLC, v. Girardi & Keese*, 2014 WL 36313, at *7 (D. Kan. Jan. 6, 2014)).

[47] *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995).

and an email informing Enutroff that Epic's contract with HollyFrontier was dead.  Even with these additional contacts, Defendant Pittman's connection with Kansas does not rise to the level of minimum contacts.  Therefore, the Court finds that Enutroff has not met is burden to show that Defendants Morgan, McKinnon and Pittman expressly aimed their activities toward Kansas.

        b.     Tort Analysis

Enutroff asserts several tort claims against Defendants:  violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 (Count II), violation of the Kansas Securities Act (Count III), intentional fraud (Count IV), and negligent misrepresentation (Count V).  For tort claims, the relevant inquiry is whether the nonresident defendant "purposefully directed" his activities at the forum state.[48]  The "purposeful direction" element requires: (a) intentional conduct (b) "expressly aimed at the forum state" and (c) "knowledge that the brunt of the injury would be felt in the forum state."[49]

Enutroff focuses almost exclusively on the third prong of the three-part test required to show "purposeful direction" in arguing that there are sufficient minimum contacts for the Court to assert personal jurisdiction.  Enutroff asserts that "it has long been the law in this District that the 'purposeful availment' prong of the two-part due process test can be satisfied by evidence showing contemplated future consequences of the defendant's tortious actions in the forum state."[50]  According to Enutroff, "Defendants knew that Enutroff was headquartered in Kansas, that its business was conducted in Kansas[,] and that it is in Kansas that the harm resulting from

---

[48] *Dudnikov*, 514 F.3d at 1071.

[49] *AgJunction, LLC v. Agrian, Inc.*, 2014 WL 3361728, at *6 (D. Kan. July 9, 2014) (citing *Newsome v. Gallacher*, 722 F.3d 1257, 1264-65 (10th Cir. 2013)).

[50] Plaintiff's Response to Defendants' Motion to Dismiss, Doc. 17, p. 43.

their actions would be felt."[51]   Enutroff therefore argues that the constitutionally required minimum contacts are present in this case.

The Supreme Court's decision in *Walden*, however, rejects this argument.  In *Walden*, the plaintiffs were traveling home to Nevada after a trip to Puerto Rico.[52]  A DEA agent seized a large amount of money from the plaintiffs while they were changing planes in Atlanta.[53]  When they returned home, the plaintiffs sued the DEA agent in Nevada federal court in part for falsifying a probable cause affidavit.[54]  The Ninth Circuit held that the defendant "expressly aimed" his tortious conduct at Nevada by submitting the affidavit with the knowledge that it would affect Nevada residents.[55]

The Supreme Court reversed the Ninth Circuit's decision.  It held that the "mere fact [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction."[56]  The relations between the defendant and the forum "must arise out of contacts that the '*defendant himself*' creates with the forum State and "the plaintiff cannot be the only link between the defendant and the forum."[57]  Because the only connection between the defendant and the plaintiffs was the fact that the defendant's conduct affected Nevada residents, the Supreme Court found that the Nevada court lacked jurisdiction.

---

[51] *Id*. at 44.

[52] *Walden*, 134 S. Ct. at 1119.

[53] *Id*.

[54] *Id*. at 1120.

[55] *Id*.

[56] *Id*. at 1126.

[57] *Id*. at 1122 (emphasis original).

Applying *Walden* here, Enutroff's theory that the Court should assert personal jurisdiction simply because Defendants knew that their conduct would harm Enutroff in Kansas fails.[58]   The "proper question is not where the plaintiff experienced a particular injury but whether the defendant's conduct connects him to the forum in a meaningful way."[59]   Therefore, the Court looks at whether any of Enutroff's allegations regarding Defendants' conduct provide a meaningful connection to Kansas.

The only allegations that connect Defendants' alleged tortious conduct to Kansas are Enutroff's assertion that Defendants Pittman, McKinnon, and Morgan, along with Epic employee Chaillet, misrepresented the state of Epic's technology, relationship with HollyFrontier, and ability to issue stock during conference calls in which Enutroff was located in Kansas.   But, as previously noted, phone calls " 'are not necessarily sufficient in themselves to establish minimum contacts.' "[60]   "Telephone contacts lack constitutional significance under the minimum contacts doctrine due to geography-defying nature of twenty-first century telephone communications."[61]   The Tenth Circuit has not stated a bright-line rule for how many phone calls would be sufficient to establish minimum contacts, but it has cited a district court opinion finding that "numerous" or "hundreds" of phone calls and letters established minimum contacts.[62]   Conversely, in *Far West Capital*, the Tenth Circuit found that the defendant's phone calls and

---

[58] *See AgJunction*, 2014 WL 3361728, at *6 (citing *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc*., 751 F.3d 796, 2014 WL 1849269, at *5 (7th Cir. 2014) (holding that any pre-*Walden* decision that implies that harming a plaintiff in the forum state alone creates minimum contacts "can no longer be considered authoritative."))

[59] *Walden*, 134 S. Ct. at 1125.

[60] *Loeffelbein v. Rare Medium Group, Inc*., 2003 WL 23484636, at *4 (D. Kan. Oct. 21, 2003) (quoting *Far West Capital*, 46 F.3d at 1077).

[61] *Proud Veterans*, 2014 WL 791200, at *8.

[62] *Loeffelbein*, 2003 WL 23484636, at *4.

ten to twenty faxes and letters sent over the course of contract negotiations were insufficient to establish minimum contacts.[63]  Here, the parties' relationship spanned only three to four months.  Enutroff has not alleged that it engaged in numerous or "hundreds" of conference calls with Defendants during the contract negotiations.  It also has not alleged that the telephone number that Loeffelbein called from or that Defendants called was restricted to being used or answered only in Kansas or, if it was, that Defendants knew that to be the case so that they might have purposefully directed their activities to Kansas.  The Court therefore finds that Enutroff has not established sufficient minimum contacts between Defendants and Kansas to satisfy due process.

2**.**     **Reasonableness Analysis**

Having determined that there are sufficient contacts between Defendant Epic and Kansas, the Court "must still determine whether exercising personal jurisdiction would offend traditional notions of fair play and substantial justice."[64]  At this point, the burden shifts to Defendant Epic to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[65]  In weighing the reasonableness of exercising jurisdiction, courts traditionally consider the following five factors:  (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, and (5) the shared interest of the several states in furthering fundamental social policies.[66]  Furthermore, in this second step of analysis, the Court should

---

[63] *Id*. (citing *Far West Capital*, 46 F.3d at 1077).

[64] *Emp'rs Mut. Cas. Co.*, 618 F.3d at 1161 (quotation omitted).

[65] *Dudnikov*, 524 F.3d at 1080.

[66] *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1279-80 (10th Cir. 2005).

consider the strength of the defendant's minimum contacts.  "[T]he weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction."[67]

Here, the Court has found that Epic has the requisite minimum contacts with Kansas. Epic allegedly solicited Enutroff's business in Kansas, made phone calls and sent emails to Enutroff in Kansas to negotiate the Consulting and Fee Agreements, and formed the alleged settlement agreement in Kansas.  These contacts, however, are weak.  None of the contracts have anything to do with this state, and the Consulting and Loan Agreements are governed by Texas law.  Furthermore, with the exception of Loeffelbein, none of the witnesses are located here. Therefore, given the weakness of Epic's contacts with Kansas, Epic's burden to show unreasonableness is low.

With regard to the first factor—the defendant's burden—the alleged facts show that Defendant Epic's principal place of business is in Texas.  Epic has no general contacts with this state.  Its officers and directors have not personally been here, and its only contacts with Enutroff have been by phone or email.  Defending this action in Kansas, therefore, would impose a burden on it.  However, because "defending a suit in a foreign jurisdiction is not as burdensome as in the past," especially for sophisticated parties, the Court finds that this factor weights only slightly in favor of Epic.[68]

The second factor looks at Kansas' interest in adjudicating the dispute.  States have an important interest in providing a forum in which their residents can seek redress for injuries

---

[67] *Trujillo v. Williams*, 465 F.3d 1210, 1221 (10th Cir. 2006) (quotations omitted).

[68] *Cont'l Am. Corp. v. Camera Controls Corp.*, 692 F.2d 1309, 1314 (10th Cir. 1982).

caused by out-of-state actors.[69]   The Court finds that this factor is neutral because Kansas, as well as Texas, has an interest in resolving disputes involving residents of its state.

Third, the court analyzes whether a plaintiff may receive convenient and effective relief in another forum.[70]   "This factor may weigh heavily in cases where the plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit."[71]   Enutroff has not alleged any facts that show this danger may be present in this case.   Therefore, this factor weighs in Epic's favor.

The fourth factor involves the interstate judicial system's interest in obtaining the most efficient resolution of controversies.[72]   The key points to consider when evaluating this factor are (1) the location of witnesses, (2) the location of the wrong underlying the lawsuit, (3) what forum's law applies, and (4) "whether jurisdiction is necessary to prevent piecemeal litigation."[73]   The Court finds that this factor favors Epic.   Enutroff has one witness located in Kansas.   The remaining witnesses are located in Texas or Colorado.   Further, the alleged breaches of the Consulting and Fee Agreements, and Defendants' alleged failure to perform the alleged settlement agreement occurred in Texas.   In addition, the acts giving rise to Enutroff's fraud and negligent misrepresentation claims occurred in Texas.   The third point is neutral because the Consulting and Loan Agreements are governed by Texas law and the alleged settlement

---

[69] *Burger King Corp.*, 471 U.S. at 483.

[70] *OMI Holdings*, 149 F.3d at 1097.

[71] *Vestring v. Halla*, 920 F. Supp. 2d 1189, 1196 (D. Kan. Jan. 30, 2013).

[72] *Pro Axess*, 428 F.3d at 1279.

[73] *Id.*

agreement and tort claims are governed by Kansas law.[74]  Finally, the fourth point favors Epic, because if the Court asserts personal jurisdiction over Epic but not the remaining individual defendants, this will result in piecemeal litigation.  Therefore, the Court finds that the fourth factor favors Epic.

As to the fifth factor—the shared interest of the several states in furthering fundamental social policies—nothing suggests that this is relevant in this case, and therefore, the Court will not address it.  Considering all of the above factors and the weak minimum contacts in this case, the Court concludes that Epic has established a compelling case that this Court's exercise of jurisdiction in this case would offend traditional notions of fair play and substantial justice. Accordingly, the Court cannot assert personal jurisdiction over Defendants.

**B.**     **Jurisdiction under the Kansas Uniform Securities Act**

Enutroff asserts that Defendants are subject to an additional basis for personal jurisdiction under the Kansas Uniform Securities Act ("KUSA").  In support of this argument, Enutroff references K.S.A. 17-12a610, which is the jurisdictional provision of the KUSA, and K.S.A. 17-12a611, which sets forth service of process under the KUSA.  Enutroff's argument fails.  The KUSA does not provide an additional basis for personal jurisdiction independent of due process concerns because that would render the statute unconstitutional and unenforceable.[75]  The Court

---

[74] This case raises choice of law issues between Kansas and Texas law.  When deciding state law claims under diversity jurisdiction, a federal district court applies the choice of law rules of the state in which it sits.  *Koch v. Koch Indus.*, 2 F. Supp. 2d 1416, 1420 (D. Kan. 1998) (citations omitted).  Kansas courts generally apply the First Restatement of Conflicts of Law to choice of law issues.  *See ARY Jewelers, LLC, v. Krigel*, 277 Kan. 464, 481, 85 P.3d 1151, 1161-62 (2004).  For purposes of tort claims, Kansas courts follow the rule of *lex loci delicti* and apply the substantive law of the state where the wrong occurs (*i.e.*, the place of injury).  *Ling v. Jan's Liquors*, 237 Kan. 629, 634-35, 703 P.2d 731, 735 (1985).  Because Enutroff claims that it accepted Defendants' alleged settlement offer in Kansas, the Court finds that Kansas law governs the enforceability of the alleged settlement agreement. And, because Enutroff asserts that it felt the harm of Defendants' alleged tortious conduct in Kansas (its principal place of business), Kansas law applies to Enutroff's fraud and negligent misrepresentation claims.

[75] *E.g.*, *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286 (1980).

has already found that it cannot assert personal jurisdiction over Defendants because it would offend due process.  Therefore, it cannot assert personal jurisdiction under the KUSA.

**C.**      **Service of Process as to Defendants Epic and McKinnon**

Defendants Epic and McKinnon also assert that this case should be dismissed because Enutroff did not properly serve them.  The Court declines to address this issue as it has already found that it does not have personal jurisdiction over defendants.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 9) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 2nd day of February, 2015.


*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE